Good morning, Your Honor. May it please the Court, Anne Saucer for Angelo Bologna. I will try to reserve four minutes for rebuttal, Your Honor. Very well. We respectfully request that this Honorable Court reverse the District Court's dismissal of Mr. Bologna's non-Hodgkin's lymphoma case against Monsanto, the manufacturer of Roundup. I'd hope to get to three topics today. Number one, the District Court abused its discretion by ignoring the most recent study cited in Dr. Zhang's expert report. Number two, the other study, mutation research, is not junk science. Finally, number three, the District Court abused its discretion by not following the standards this Court has promulgated in multiple cases with regard to the admissibility of expert testimony on causation in toxic exposure cases. Let me ask you this. I'm sure you're well prepared for all of this. As you know, the District Judge in this case has had it for, I think, ten years. Has had lots and lots and lots of testimony, lots and lots of analyses requiring a Daubert analysis. As I look at what the District Court did here, it seemed to touch on the various Daubert criteria. You don't agree with the judge's interpretation of those criteria. But, for example, in citing one of the cases, I forget which one it was, a Bersetti or something, he said that the doctor had basically cut parts of it out in the analysis. I don't know whether that's right, but that was, if I recall correctly, the analysis. And that allowed him to say, this is not apples and apples, it's apples and oranges. So what I'd like you to answer for me is this. Under Daubert, I understand the Supreme Court to have said that essentially the District Judge has almost a holistic ability to analyze, as the gatekeeper, what expert testimony goes in. There's no question that he, in this case, noted that this was peer reviewed. He said that. He noticed that there was analysis of various kinds. He also said it was kind of late, it was 2019. In short, he gave reasons for why he didn't think the Daubert analysis was adequate here. What am I missing? So, with regard to the last point first, the criticism about the timing of 2019 goes to my first point.  Dr. Sang's testimony was so up to date in this case that her ChemiSphere paper, a 2023 paper, was still in galleys. It was, she submitted and attached and incorporated it by reference in her expert report. That paper was wholly ignored by the district court except for a footnote that selectively quotes it but omits the operative language. So that footnote of the district court opinion says, this is not a causation opinion, but quotes, actually misquotes, add words that aren't there, to the ChemiSphere paper, overlooking what the abstract says and what the paper repeatedly says about causation. In that paper, the ChemiSphere paper, the abstract clearly says, the International Agency for Research on Cancer found the active ingredient in Roundup to be a probable human carcinogen based on mechanistic criteria. And then it says, we, Dr. Sang and her six fellow scientists who authored that paper, have looked at the emergent evidence on key characteristics of how a human cell turns into a cancer cell. And we found further evidence supporting the IARC's general causation opinion. But did not say, if I recall correctly, we conclude that this was a cause of what the plaintiff was asking. Is that right? You're right. Okay, so the evidence. But you did talk about how conceptually, scientifically, it could be a cause, but didn't say this was the cause, right? So that's not the conclusion, but it's in the abstract. So the abstract clearly says that it uses the words, classified as a probable human carcinogen. And neither Monsanto nor the district court has explained why that language is any different from a general causation opinion. They've just ignored that language. Isn't it just citing to what the U.N. body? Actually. It's not a conclusion in itself. No, Your Honor. It goes on to say, this is what the U.N. concluded, and then it goes on to say, we find strong evidence in support of that conclusion. Okay, clear evidence that glyphosate interacts with receptors. It says later in here, our findings strengthen the mechanistic evidence that glyphosate is a probable human carcinogen. So this is right here. It's in the record, ER352. Our findings strengthen the mechanistic evidence that glyphosate is a probable human carcinogen. Okay, that's all true. But, I mean, going back to even back in the 50s about artificial sweeteners and the like. All kinds of things like that, but there was never anything that said this causes cancer in this person. And I think that's what the judge was struggling with here. There's no connection. You've got a U.N. finding. You've got science finding. But nobody says this is the causation. Why would that not be relevant to the district judge's determination? Your Honor, this is a general causation opinion, so it was not intended to be. There was another expert that was going to speak to specific causation with regard to this plaintiff. This Court has never required a study to say that there is causation in those exact words in the four corners of the study. So the Messick case decided by this Honorable Court, 747F 3rd, 1198-99. This Honorable Court accepted a position paper, and it was an association of like oral surgeons. And the position paper said- I respect that. But the reality is what we have to look at is a judge that had this case for ten years, seen all kinds of things, heard all kinds of things, and he has to decide what goes to the jury. You've got these statements, very learned people, heavily science-oriented, but he wants to know what should go to the jury. And he's looking for something to directly tie it here. So what's the matter under a Daubert analysis where it's holistic as a gatekeeper, in effect? What's wrong with what he did here? What's wrong with what he did? So there's more than one thing wrong. But going back to mutation research, what's wrong with what he did is he completely ignored this paper other than a footnote that does not accurately cite mutation research. It's in the record beginning at ER 352. It's one of two papers that Dr. Zhang incorporated by reference into her expert report. And Monsanto's only answer to this is we get a pass for misstating in our motion that we won, that this was not the paper that was relied on, and then they say ignore it because it's not an epidemiological study. It's a mechanistic study, saying over and over and over again that there is strong evidence that glyphosate mechanically at the cellular level turns normal cells into cancer cells. In the Kennedy case — Can I ask, do you agree that, you know, the part cited by the district court in footnote 5, do you agree that that does not show a causation, an opinion about causation? On note 5? Yes. Footnote 5, which quotes from the conclusion of that mechanistic paper. I think that that language, which only looks at the conclusion, it doesn't look to the abstract, is — I don't think it can — I don't think that it can be read like that, ignoring every single other thing that's stated previously in the paper. Well, I mean — I mean, it is the conclusion of the whole opinion. It seems reasonable to say, let's look at what the conclusion is, and it doesn't quite get up there. I mean, sometimes, you know, the Supreme Court decisions, the abstracts don't govern. I just wonder if that's the same way with these scientific articles. Well, it's in the record here that the scientists wrote the abstract. At least that's in the record with regard to mutation. May I talk — Well, then, I mean, is it reasonable, then, that the abstract's conclusion doesn't meet the paper's conclusion? Like, isn't that — Your Honor, the — Isn't that problematic in itself? I don't think it's problematic because I think this conclusion is written for scientists. It's not written for lawyers. And it may not have the word causation in it, but the word probable carcinogen, which is the general causation opinion, is previously in the study more than once. It's not just in the abstract. It's on the second page. And what chemistry — everything in chemistry has been ignored, and that's an abuse of discretion pursuant to Kennedy and Elusu and Hardiman. Let me — may I say what the entirety of this ignored paper says? It says there is strong evidence of Roundup's genotoxicity, which mechanistically causes cancer. There is strong evidence that Roundup induces oxidative stress, which mechanistically causes cancer. There is strong evidence that Roundup causes chronic inflammation, which mechanistically causes cancer. There is strong evidence that Roundup is an endocrine disruptor, which mechanistically causes cancer. There is some evidence that Roundup is electrophilic, which mechanistically causes cancer. There is some evidence that Roundup causes genomic instability, which mechanistically causes cancer. And I might have left one off the list, but what this says is that there are 10 emerging characteristics, key characteristics for how a human cell that's a normal cell becomes a cancer cell. And Roundup is 7 to 3 for the evidence showing that it causes cancer. If I may speak to the Elusu case, the Kennedy case, and the Hardiman case, and why those decisions show that ignoring all of this was an abuse of discretion. Those — what those — what happened in Kennedy was there was a plaintiff's expert who had peer review, published literature, and the district court refused to consider any of it because it did not — the plaintiff's lawyer did not — the plaintiff's expert did not have an epidemiological study that, with the four corners of the epidemiological study, proved causation. And this honorable court said it was an abuse of discretion because there was other evidence in the public literature that needed to be considered. And in Elusu, this honorable court in 2022 cited Kennedy and followed it. So it is not proper to say — Monsanto's only argument for ignoring this, what they say, is that it's not an epidemiological study. But this Court has said repeatedly that the Court cannot put blinders on to all of the other evidence, including strong mechanistic evidence, that something does in fact cause the plaintiff's condition simply by obsessing over the words causation in an epidemiological study. Do you want to save any of your time? It's entirely up to you. I'm sorry. I will save my time. I apologize. Thank you for — No, it's up to you. It's your time. Thank you, Your Honor. Very well. Mr. — you say Otten? Is that correct? That's correct, Your Honor. Good morning, Your Honors. May it please the Court. Daniel Otten on behalf of Appelli Monsanto Company. Counsel spent most of her time talking about the 2023 mechanistic and animal study. So I'm going to start with a promise that I am going to get to that, and I'm going to explain that the District Court didn't ignore it, and it doesn't state a general causation opinion. But if Your Honors would permit, I'd actually like to start with what is the heart of the District Court's opinion, and that is that Dr. Zhang's other study that was disclosed as part of her opinion was not a reliable study and was not a reliable treatment of the epidemiology data, the human data. And I'll say at the outset, I think Your Honor made a very good point. Judge Tabria, the District Court judge, has been acting as a gatekeeper in this litigation for just about 10 years. I would submit that he did in this case exactly what Rule 702 requires. He held plaintiffs to their burden to prove that Dr. Zhang's opinions were reliable and would be helpful to the jury, and he found that there were multiple ways in which they didn't meet that burden. Let me ask you this. Obviously, Daubert's the key to this whole thing. It appears that Judge Tabria, if you will, touched on each of the elements involved, didn't ignore them. There's a disagreement about what they meant. There's a disagreement about the peer review. There was what got cut out, what not, the Ambrosetti, whatever. But when we look at Daubert, the District Court has a great deal of discretion, doesn't he, in determining whether, in this case, his opinion, looking at the facts as presented, even though they're scientific, it's not enough to get it to the jury. That's where the discretion comes in. Is that correct? I think that's right, Your Honor, and I think the foundational Rule 702 cases are clear that the factors that are articulated in Daubert and plaintiffs have picked out and focused on two of them, those are non-exhaustive discretionary factors. The foundational cases say that. In this circuit, Daubert, too, said that establishing, for example, peer review information prior to litigation, quote, would not, of course, be conclusive. And the Supreme Court, in its Daubert decision, said peer review publication, quote, will be a relevant, although not dispositive, consideration. And here, to Your Honor's point, the Court considered both of those factors. It considered the fact that Dr. Zhang published her paper in the literature and that that happened prior to litigation and discussed those factors. It gave them some weight, but it determined that there were other factors weighing against the reliability of that study and her opinions. That's not an abuse of discretion. That's applying the correct legal standard. It's exactly what Rule 702 and especially Rule 702D require the court to do as a gatekeeper. And on this issue— Do you think, counsel, that those two factors are the primary criteria? I know that there are some cases that use that kind of language. What I would say is that the cases are very clear that they are non-exhaustive and discretionary. I believe in the Kumotaira case, the Supreme Court said that the district court has great leeway in deciding what factors are or are not relevant to assessing reliability in a particular case. So I don't think—I know plaintiffs cite a few quotes here and there describing them that way. I don't think that goes very far in terms of characterizing them. And turning to the district court's analysis or assessment of the reliability of Dr. Zhang's 2019 meta-analysis, I think it's critically important context to keep in mind that Dr. Zhang didn't provide a traditional expert report in this case. Instead, they provided a disclosure that said these two studies, that 2019 study and then the 2023 study, those are her report. They set out her entire set of opinions and the bases for them. And that's the context in which the district court had to assess that 2019 study. The question was not just, is this a study that would be fit for publication in a journal somewhere? The question was, is this a reliable expert opinion on general causation to state a general causation opinion in this case? That's the context in which it assessed it. It determined it wasn't reliable. And the core reliability issue with that study, Your Honors, is that Dr. Zhang in the study claimed that it is an analysis of individuals with high exposure to glyphosate. That was her hypothesis, and that's what the conclusion of the study says. But when you look at how she used the data, and Your Honor alluded to this earlier, it wasn't actually an assessment of individuals with high exposure. And I want to explain that a little bit. And I know it's a little complicated, especially for those who aren't steeped in this litigation. But Dr. Zhang used six studies in her meta-analysis. Half of those studies, so three of the six, did not break out their participants by exposure level. All they did was ask, have you ever been exposed to glyphosate? So for those three studies, we don't know whether they've been exposed for one day, or 100 days, or 1,000 days. All we know is that they've ever been exposed. The way that Dr. Zhang carried out her analysis, she said the highest exposure group for those three studies is the whole study. So she pulled in all of the data from those studies where we don't know the exposure level. There are a couple of problems with that, significant problems. Do you mind if I interrupt to ask a broader question?  You know, I think these are arguments the other side would say are more persuasive for the jury. You know, we're here primarily about admissibility. And, you know, it's a recurring theme in the law that district courts are given discretion to do certain things, but courts of appeals try to set some guardrails up. We had a case yesterday about when it's something rare and exceptional, which could be taken to give the district court a lot of discretion, but the public courts have also tried to set up some guardrails to limit that. And so one of the guardrails that this court's precedents call out is peer review. The district court below distinguished between editorial peer review and true peer review. Do you support that distinction, and do you think that has some rooting in this court's precedent? And if you could just speak more broadly to, you know, is that the sort of analysis that you think an appellate court should be doing in getting in? You might call it micromanaging. Do you support us putting those guardrails, you know, carrying on those a little more fine-grained review of these decisions as a matter of law as opposed to deferring? I appreciate the question, Your Honor. Let me start briefly with the editorial versus true peer review point, and then I'll address the broader point. On the question of true peer review versus publication peer review, that wasn't the basis for the district court's decision. I'll note that that reference to, quote-unquote, true peer review is in a parenthetical near the end of the order. All the court was getting at is publication in a study is one thing. It is a factor that should be assessed when considering reliability. The reaction of the scientific community is another factor that should be assessed when considering reliability. And here the district court assessed both. There have been people who have been very critical of Dr. Zhang's paper since it's been published, but that's not the basis on which it determined that it was unreliable. And so I don't think that that is a key consideration. You don't think we need to adopt that distinction here? I don't think so, Your Honor, because that wasn't the basis for the district court's decision. Now, to address the broader point, which is a point well taken, and the point I made at the outset about the context of Dr. Zhang's paper being disclosed as her report in this case is important context. Given that disclosure, it's not only within the court's discretion. Rule 702D actually requires that the court assess whether the analysis set forth in that paper is a reliable application. Because for the same reason that if an expert served a traditional report and said, I've applied the Bradford Hill analysis, it wouldn't be enough for the court to say, well, that's a reliable methodology and go no further. Under 702D, it would have to assess, well, did they actually conduct a reliable Bradford Hill analysis? Same is true here. Dr. Zhang has said this epidemiology meta-analysis is my opinion on the epidemiology literature. And that's where your point about the exposure gets in. Whether a little bit of exposure or a lot of exposure, the district court can make that analysis himself, whether or not the peers did that, right? Well, and that it's not an issue that just goes to weight or that should go to the jury. It's a methodology issue because what Dr. Zhang is claiming she did does not match up to her actual use of the data. That's a 702D issue. That's a reliability issue. And to go back to my point about that, she pulled in from three studies all of the data where we truly don't know what the exposure level was. And stepping back, to be clear, that means that for the majority of the cases in her meta-analysis, we do not know whether they were exposed to glyphosate for one day, 100 days, or 1,000 days. But Dr. Zhang nonetheless says, this lets me conclude that individuals with high exposure have an increased risk. And that's the reliability issue, that there's no reason to think that the majority of the cases in her analysis actually had high exposure. We just don't know. And it's within the district court's discretion to conclude that an opinion like that, where the use of the data does not match up to what she says the conclusion is, what she says she set out to do is unreliable. Now, let me fulfill my promise to get back to the 2023 paper. The first point is, well, let me start with, it's undisputed that that paper is not a treatment of the epidemiology. Literature, it is an assessment of data in animal and cell studies. And a panel of this circuit in the Hardeman case made clear that at least in the context of this litigation, a general causation opinion has to be based on the epidemiology data. Hardeman said, this is Hardeman from 2021 at 952, quote, to be admissible testimony, the experts must have reliably based their general causation opinions on epidemiological evidence showing a connection between glyphosate and cancer. Why is that the case? That doesn't make sense to me. That seems like a jury question. That's what the panel said in Hardeman. And the reason is that there's a large body of studies of exposure to glyphosate in humans. And so that is the best scientific evidence. And so you have to at least start with the conclusion that that evidence, the best evidence, shows a connection before you turn to animal and cell studies. And that's not to say that those can't be. Why can't you use weak evidence to support it? That doesn't make sense to me. Respectfully, Your Honor, that is what the court said in Hardeman, which I think is right, that where you have a strong or a significant body of human studies, you can't say, well, that doesn't show a connection, but I'm going to turn to weaker cell studies. And somehow that shows the general causation opinion. That's consistent with the gatekeeping that the court has been doing for years in this litigation. I think it's well-supported, and it was confirmed in Hardeman. I mean, the jury could make the inference that if it causes cancer in animals, it will cause cancer in humans, right? You can't reliably make that leap where you have a large body of human studies and if they're inconsistent with that conclusion. And so counsel said that the court ignored the 2023 study. That's just demonstrably not true. It cited it. It discussed it. It's in its order. And its point was, consistent with that quote that I just read from Hardeman, a general causation opinion in this litigation has to be based first and foremost on the human studies, that publication. But that's not the reason why the district court excluded it. It said that there was just no causation. And your friend on the other side is saying if you read the abstract, there is some causation statements in the report. So what's your response to that? Yeah. Let me get to that. And the only thing to wrap up — You only have two minutes. Why don't you get to it now? Sure. I'll do it now. The phrase that she points to is the phrase probable human carcinogen. They say it in their brief. She said it just now. I know that that might sound to the layperson like a causation opinion. It's not. And here's why. And the Hardeman panel explained why it's not, and so did the district court in the decision that was affirmed. That probable human carcinogen is a phrase that comes in a classification that is used by IARC. And that is the body of the World Health Organization, as Your Honor said. That's the context in which Dr. Zhang uses it in that paper. The way that IARC makes that classification is they look at whether an exposure to a substance at any level, including levels that humans could never experience, could potentially cause cancer. It's called a hazard assessment. That's what that classification represents. That is not the general causation threshold in inquiry in this case. And in Hardeman, the court framed it as that the experts need to show that glyphosate can cause NHL at exposure levels humans can experience. And for that reason, the district court, when discussing the IARC hazard classification, it said in the decision that was affirmed in Hardeman, a hazard assessment, as IARC and other public health bodies define that inquiry, is not what the jury needs to conduct when deciding whether glyphosate actually causes NHL in people at past or current exposure levels. The panel affirming that decision similarly said, quote, that the hazard determination, quote, did not include a risk assessment, gauging carcinogenic effects from real-world exposure. And so counsel has been very clear that their view is probable human carcinogen is a general causation opinion. That's not the case in the decisions, the published decisions of this circuit have addressed that and said it's not the case. And so I have 10 seconds left. I'll happily give Your Honors that time back. Thank you. If you don't have any further questions. I think not. Thank you very much. Thank you, Your Honors. All right. Ms. Souser, you have some rebuttal time. The point to opposing counsel's last point, the point is not just that probable human carcinogen was said, but the point is that the entire study explains why it is that those findings are further supported. But if I may pivot to mutation research, which was called junk science. All of the criticisms, beyond the personal insults of the doctor, all of these criticisms flow from two facts. Number one, that the a priori hypothesis was applied. We filed in the district court record eight studies applying that hypothesis. We, for purposes of this appeal, found over a dozen more. The a priori hypothesis is Bradford Hill. It is a recognized scientific methodology that has been applied again and again and again. This complaint that, well, we don't know, she set out to say high exposures, but we don't really know, that goes to the fact that these six studies were used. Both, Sano has very heavily relied on the EPA Miller opinion. Miller agreed these same six studies were the appropriate studies. Dr. Zhang and her four co-scientists writing mutation research could not have changed what those study authors decided to do in terms of how they stratified the exposure data. So they had to deal with the limits. Some of those studies stratified, some of them did not. So this complaint that it's supposed to get you the highest concentration, some of those studies did not break out the numbers. And there's a complaint at length that, at length in the briefing, looking at, well, here's a number from, I think it's McDuffie or Erickson, and it's higher exposure than the second quadrant number from Andriotti. All of that is simply a complaint that the a priori hypothesis was applied to the same six studies that EPA's Miller said were appropriate to study on this issue. Counsel, can I interrupt you in your minute and ask, that criticism may or may not have merit. We're here on abusive discretion review, and that's a very in-the-weeds criticism, and we'll engage with it. What do you think is your highest level of generality criticism of the way the district court abuses discretion, as opposed to the in-the-weeds level? The district court abuses discretion because, as Your Honor noted, this court has promulgated two significant factors on controlling the admissibility of expert causation evidence, and both of those factors are met here, that Dr. Zhang was not involved in 2019 in any sort of litigation of plaintiffs, number one, and number two. Her, this, not only her paper was peer-reviewed, but, as I said, the a priori hypothesis, and it's the proper application of the a priori hypothesis that has generated all of this criticism. There are simply limits to applying the a priori hypothesis. When you are, she and her four scientists looked at the work of other studies from around the world, and they had no ability to go and control the fact that some of them categorized exposures differently and some of them did not. And so it's abuse of discretion to ignore the two primary, those two primary factors promulgated by this honorable court. And there is a footnote in Daubert, too, that says if you want to rebut, overcome the deference we, the Ninth Circuit, give to these two primary factors, then you, the defendant, can bring in your own evidence, and they did not do that at this hearing. They did not come forward with anyone to say there was no peer review. A lot of the statements that are made in the brief are simply opinions made by Monsanto that they did not prove up in this case. Okay. Your time is up. Let me ask my colleagues whether they have additional questions. Thanks to both counsel for your learned argument. We appreciate it. This is a significant case. The case just argued is submitted, and the Court stands adjourned for the day. Thank you, Your Honor. All rise.
judges: SMITH, BUMATAY, Barker